**Frank TEAGUE, Petitioner-Appellant,**

v.

**Michael LANE, Director, Department of Corrections, and Michael O'Leary, Warden, Respondents-Appellees.**

No. 84–2474.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 23, 1986.

Decided May 11, 1987.[*]

---

* The original opinion in this case with Judge John L. Coffey dissenting was circulated to the active members of the court pursuant to Circuit Rule 16(e). A Majority of the court voted to rehear the case en banc.

Patricia Unsinn, Office of State Appellate Defender, State of Ill., Chicago, Ill., for petitioner-appellant.

Mark L. Rotert, Asst. Atty. Gen., Chicago, Ill., for respondents-appellees.

Before BAUER, Chief Judge, CUMMINGS, WOOD, CUDAHY, POSNER, COFFEY, EASTERBROOK, and RIPPLE, Circuit Judges.

The original panel decision in this case reversing the order of the district court that denied the appellant Frank Teague's petition for a writ of habeas corpus was vacated, *United States ex rel. Teague v. Lane,* 779 F.2d 1332 (7th Cir.1985), and the case set for rehearing en banc pursuant to Circuit Rule 16(e).[1] We now affirm the order of the district court denying Teague's petition for a writ of habeas corpus.

I

COFFEY, Circuit Judge.

Teague, a black man, was convicted after a jury trial in an Illinois court for attempted murder and armed robbery.[2] In the process of selecting the *Teague* jury, the prosecution in the exercise of its peremptory challenges excluded ten black jurors. In the exercise of the defendant's peremptory challenges, the only other black on the juror list was removed. The defendant initially challenged the State's use of its peremptory challenges after the State had exercised six of its peremptories and again after jury selection was completed claiming that the State's exclusion of all blacks from the jury deprived him of his right to "trial by a jury of his peers." The trial court rejected the defendant's argument that he was deprived of a "trial by his peers" stating that "the jury appears to be a fair jury" and the Illinois Court of Appeals affirmed the defendant's conviction explaining that no restriction could be placed on a prosecutor's exercise of peremptory challenges in the absence of a demonstration that blacks had been systematically excluded under the *Swain v. Alabama* test. *People v. Teague,* 108 Ill.App.3d 891, 64 Ill.Dec. 401, 439 N.E.2d 1066 (1st Dist. 1982). The Illinois Supreme Court denied Teague's Petition for Leave to Appeal, 93 Ill.2d 547 (1983), and the United States Supreme Court denied *certiorari.* 464 U.S. 867, 104 S.Ct. 206, 78 L.Ed.2d 179 (1983). Teague then filed a petition for a writ of habeas corpus in the federal district court.

---

**1.** The rehearing en banc was postponed until after the United States Supreme Court had decided *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), which was pending before the Supreme Court when we vacated the original panel decision in *Teague.*

**2.** Teague was charged with attempted murder, aggravated battery, and armed robbery. Section 115–4(e) of the Illinois Code of Criminal Procedure provides in pertinent part:

"A defendant ... shall be allowed 20 peremptory challenges on a capital case, 10 in a case on which the punishment may be imprisonment in the penitentiary [including attempted murder and armed robbery], and 5 in all other cases.... The State shall be allowed the same number of peremptory challenges as all defendants."

Ill.Rev.Stat. Ch. 38, 115–4(e).

The district court denied Teague's petition for a writ of habeas corpus explaining that Teague's claim that his constitutional rights were violated by the prosecution's use of its peremptories was "foreclosed by *Swain* and the Seventh Circuit's recent decisions in *United States v. Clark* [737 F.2d 679 (7th Cir.1984)], and *United States ex rel. Palmer v. DeRobertis*, [738 F.2d 168 (7th Cir.1984)]."

■ ■ In *Batson*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court decided that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." [3] The *Batson* decision expressly overruled *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), but did not address the sixth amendment question concerning the right to a trial by an impartial jury. In *Allen v. Hardy*, — U.S. ——, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986), the Supreme Court held that *Batson* was not to be applied "retroactively [to cases such as Teague's] on collateral review of convictions that became final before our opinion [in *Batson*] was announced." [4] However, even if *Batson* were to be applied retroactively to Teague's case, it would not control this court's disposition of Teague's petition for habeas corpus, since Teague challenges his conviction on sixth amendment [5] grounds and does not raise an equal protection claim subject to the holdings in *Batson* and *Allen*. [6]

## II

In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court held that "The Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Id.* 106 S.Ct. at 1719. The *Batson* decision

3. The Equal Protection Clause of the Fourteenth Amendment provides: "[No state shall] deny to any person within its jurisdiction the equal protection of the laws."

4. Teague argues that we should determine the "finality" of his appeal as of the date the Supreme Court denied *certiorari* in *McCray v. New York*, 461 U.S. 961, 103 S.Ct. 2438, 77 L.Ed.2d 1322 (1983). However *Allen* makes clear that "finality" for purposes of the retroactive application of *Batson* is to be determined as of the date *Batson* was decided and Teague has not persuaded us that *Allen* means anything other than what it expressly states.

5. The sixth amendment provides:
"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."

6. Counsel for Teague asserted at oral argument that this court could decide Teague's appeal on Equal Protection grounds under *Swain v. Alabama* if we refused to apply *Batson* retroactively to Teague's appeal. Although we are persuaded

by the State's argument that Teague did not specifically raise a *Swain v. Alabama* claim in the state court and therefore he is procedurally barred from doing so under *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), we reject Teague's Equal Protection argument in substance as well. Teague did not claim in state court nor in the district court that the prosecution had engaged in the systematic exclusion of blacks from petit juries in case after case. Thus, Teague has failed to meet his initial burden under the *Swain v. Alabama* analysis. Teague also argues, based on *Weathersby v. Morris*, 708 F.2d 1493 (9th Cir.1983), that where the prosecutor volunteers an explanation for the use of his peremptory challenges, *Swain* does not preclude the court from examining the stated reasons to determine the legitimacy of the prosecutor's motive in exercising his peremptories. This court has refused to read *Swain* so broadly. In *United States v. Clark*, 737 F.2d 679, 682 (7th Cir.1984), we noted that absent evidence that established a pattern of systematic exclusion of blacks "larger than the single case" there was no basis for an Equal Protection challenge even if it could be demonstrated that the prosecution had exercised its peremptories on the basis of race. Accordingly, even if Teague's Equal Protection claim based on *Swain* was not barred under *Wainwright v. Sykes*, we would reject it on the basis of our prior refusal to read *Swain* as broadly as the Ninth Circuit has in *Weathersby*.

adopted a new analysis for establishing whether the prosecution's use of its peremptory challenges had violated the Equal Protection Clause and "reject[ed] this [the *Swain v. Alabama*] evidentiary formulation [for establishing Equal Protection violation] as inconsistent with standards that have been developed since *Swain* for assessing a prima facie case under the Equal Protection Clause." *Id.* Under *Batson,*

> "a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. To establish such a case, the defendant first must show that he is a member of a cognizable racial group, *Castaneda v. Partida, supra,* 430 U.S. [582] at 494, 97 S.Ct. [1272] at 1280 [51 L.Ed.2d 498 (1977)], and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.' *Avery v. Georgia, supra,* 345 U.S. [559] at 562, 73 S.Ct. [891] at 892 [97 L.Ed. 1244 (1953)]. Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the empanelling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination."

*Id.* at 1722–23. The *Swain* court refused to adopt a rule that would allow a criminal defendant to establish an Equal Protection violation simply by demonstrating that in his particular case, the prosecution had used its peremptories to remove all blacks from the jury actually empanelled to try the defendant:

> "In the light of the purpose of a peremptory system and the function it serves in a pluralistic society in connection with the institution of jury trial, we cannot hold that the constitution requires an examination of the prosecutor's reasons for the exercise of his challenges in any given case. The presumption in any particular case must be that the prosecutor is using the State's challenges to obtain a fair and impartial jury to try the case before the court. The presumption is not overcome and the prosecutor therefore subjected to examination by allegations that in the case at hand all Negroes were removed from the jury or that they were removed because they were Negroes. Any other result, we think, would establish a rule wholly at odds with the peremptory challenge system as we know it. Hence the motion to strike the trial jury was properly denied in this case."

380 U.S. at 223, 85 S.Ct. at 837. Instead, *Swain* required that a defendant seeking to establish an Equal Protection violation must demonstrate that the prosecutor systematically used his peremptories to exclude Blacks or other suspect classes from petit juries in case after case, and not just that all Blacks were peremptorily removed from the jury in the particular defendant's case:

> "We have decided that it is permissible to insulate from the inquiry the removal of Negroes of a particular jury on the assumption that the prosecutor is acting on acceptable considerations related to the case he is trying, a particular defendant involved and the particular crime charged. But when the prosecutor in a county, *in case after case,* whatever the circumstances, whatever the crime and *whoever the defendant or the victim may be,* is responsible for the removal of Negroes who have been selected as qualified jurors and the jury commissioners and who survive challenges for cause, with the result that *no Negroes ever serve on petit juries,* the Fourteenth Amendment claim takes on added significance."

*Id.* (emphasis added).

*Batson* rejected this approach as a requirement for establishing an Equal Protection violation based on the prosecutor's use of

peremptory challenges. The court explained that *Swain:* "Placed on defendants the crippling burden of proof" and thus "prosecutors peremptory challenges are now arguably immune of constitutional scrutiny." 106 S.Ct. at 1720–21 (footnote omitted). Accordingly, the court in *Batson* rejected the *Swain* court's "evidentiary formulation [for establishing that a prosecutor used its peremptories for a constitutionally impermissible purpose] as inconsistent with standards that have developed since *Swain* for assessing a prima facia case under the Equal Protection Clause." *Id.* at 1719.

■ The *Batson* decision makes clear that the court decided the case on equal protection grounds and declined to rule on Batson's claimed sixth amendment violation:

"We agree with the State that resolution of the petitioner's claim properly turns on application of equal protection principles and express no view on the merits of any of petitioner's Sixth Amendment arguments."

*Batson,* 106 S.Ct. at 1716 n. 4.[7] Although in *Batson* a criminal defendant was allowed to establish a violation of the equal protection clause by alleging, as Teague has, that the prosecution exercised its peremptories solely on the basis of a prospective juror's race, the Supreme Court's *Allen v. Hardy,* —— U.S. ——, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986) decision, precludes an application of the *Batson* rule to Teague's appeal. In *Allen,* decided just two months after *Batson,* the court held that *Batson* did not apply "retroactively on collateral review of convictions that became final before our opinion [in *Batson*] was an-

nounced." The court went on to explain that:

"By final we mean where the judgment of conviction was rendered, the availability of appeal exhausted, and the time for petition for *certiorari* had elapsed before our decision in *Batson v. Kentucky.*"

*Id.* at n. 1. Teague's appeals were rejected by the Illinois appellate courts and his petition for writ of *certiorari* from the United States Supreme Court was denied on October 3, 1983. *See Teague v. Illinois,* 464 U.S. 867, 104 S.Ct. 206, 78 L.Ed.2d 179 (1983). Thus, Teague's case is "final" for purposes of applying *Batson* retroactively and therefore our review of Teague's appeal is limited solely to his sixth amendment argument, an argument the Supreme Court declined to consider in *Batson.*

Essentially, Teague relies on *Smith v. Texas,* 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84 (1940), and subsequent Supreme Court decisions, to argue that the "fair cross section of the community" requirement as found in the sixth amendment is applicable to jury pools from which the petit jury is selected to reflect the trial community and must likewise be applied to the jury ultimately empanelled (petit jury) for trial. Teague asserts that the use of peremptory challenges to exclude certain classes of a community from the petit jury in effect undermines the Supreme Court's fair cross-section requirement in the jury pool and contravenes the very idea of a jury composed of the peers and equals of the person on trial. Teague acknowledges that the Supreme Court in *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), refused to extend the fair cross-sec-

---

7. The concurring and dissenting judges apparently read footnote 4 in *Batson* as implying that the Supreme Court decided *Batson* on Equal Protection grounds even though the petitioner had never raised an Equal Protection claim. The petitioner in *Batson,* unlike Teague, objected to the prosecutor's use of peremptory challenges on Equal Protection grounds in the state trial court, and thus, there was a basis in the record for deciding *Batson* on Equal Protection grounds. In contrast, since Teague based his objection to the prosecutor's use of peremptories on the fair cross-section requirement of the Sixth Amendment there is no basis in the record

for deciding his appeal on Equal Protection grounds. Teague's subsequent arguments in the state courts did not address Equal Protection and thus Teague's appeal is clearly distinguishable from *Batson.* Teague asserted an Equal Protection argument more than one year after his initial argument before this court pursuant to our request that the parties brief the effect on Teague's appeal of the Supreme Court's decision in *Batson.* Unfortunately for Teague, the Supreme Court's decision in *Allen* makes clear that Teague is not entitled, any more than the petitioner in *Allen,* to raise an Equal Protection claim at this stage in the proceedings.

tion requirement to the petit jury, but maintains that two Supreme Court cases, *Williams v. Florida,* 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970), and *Ballew v. Georgia,* 435 U.S. 223, 98 S.Ct. 1029, 55 L.Ed.2d 234 (1978), addressing the small number of jurors on petit juries support his argument that the sixth amendment requires the fair cross section principle be applied to petit juries as well as the jury pools they are drawn from. Teague asserts that *Williams v. Florida,* stands for the proposition that the sixth amendment requires that the petit jury must be selected pursuant to procedures that provide a "fair possibility" of obtaining a petit jury representative of the community. Accordingly, Teague reads the Supreme Court's determination in *Ballew v. Georgia,* that a trial by jury of less than six persons [8] violates the sixth amendment because it in effect mathematically decreases the opportunity for meaningful representation of a cross section of the community as supporting his position. Teague interprets *Ballew* as meaning that the use of peremptory challenges to remove prospective jurors on the basis of race alone violates the sixth amendment since exercising one's peremptory challenges on the basis of race alone decreases the "opportunity" for minority representation on the petit jury and thereby prevents the jury from reflecting a fair cross-section of the community. Therefore, according to Teague, the use of peremptories to remove prospective jurors on the basis of race alone violates the sixth amendment since the petit jury ultimately empanelled does not reflect a fair cross-section of the community.

■ Teague's argument that the petit jury should be considered the same as the jury pool for purposes of the fair cross-section requirement rests on the mistaken assumption that the word "impartial" as used in the sixth amendment requires that the petit jury reflect a cross-section of the community from which it is drawn. Teague has not argued to this court nor any of the other courts that have heard his case, that the jury that tried him was not impartial. Rather, he asserts only that the jury in his case did not represent a cross-section of the community wherein he was tried. We refuse to break new ground and read such a requirement into the sixth amendment for the decisions of the United States Supreme Court to date fail to support such an argument. Since we agree with the United States Supreme Court and not with Teague's theory that the sixth amendment requires that the petit jury be identical to the community where the jury is drawn from, we reject Teague's assertion that the prosecutor's use of his peremptories to remove ten prospective black jurors from the petit jury violated his sixth amendment right to trial by an impartial jury.

The sixth amendment provides that:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed...."

The United States Supreme Court has consistently interpreted the sixth amendment right to trial by an impartial jury to require a jury that is "indifferent" and that the petit jury be selected from a "fair cross-section of the community:" "In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors," *Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961), and "A fair possibility for obtaining a jury constituting a representative cross section of the community." *Taylor v. Louisiana,* 419 U.S. 522, 529, 95 S.Ct. 692, 697, 42 L.Ed.2d 690 (1975). In *Taylor,* the court explained:

"The unmistakable import of this court's opinions, at least since 1940, *Smith v. Texas, supra,* and not repudiated by intervening decisions, is that the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial. Recent federal legislation governing jury selection

---

**8.** The following states allow trial by a jury of less than twelve persons in felony cases: Arizona, Connecticut, Florida, Louisiana, Massachu- setts, Nebraska, and Utah. *State Court Organization 1980,* National Center for State Courts (1980).

within the federal court system has a similar thrust. Shortly prior to this court's decision in *Duncan v. Louisiana, supra* [391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968)], the Federal Jury Selection and Service Act of 1968 was enacted. In that Act, Congress stated 'The policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes.' 28 U.S.C. § 1861. In that Act, Congress also established the machinery by which the stated policy was to be implemented. 28 U.S.C. §§ 1862 through 1866. Passing this legislation, the Committee Reports of both the House and the Senate recognized that the jury plays a political function in the administration of the law and that the requirement of a jury's being chosen from a cross section of the community was fundamental to the American system of justice. Debate on the floors of the House and Senate on the Act invoked the Sixth Amendment, the Constitution generally, and prior decisions of this Court in support of the Act."

419 U.S. at 529-31, 95 S.Ct. at 697-98 (footnotes omitted). Although the Supreme Court has interpreted the sixth amendment to require that the jury in a criminal trial be chosen from a jury pool that represents a fair cross-section of the community, it has never interpreted the explicit command of the sixth amendment that the petit jury itself be "impartial" to require that the petit jury actually represent each and every element of the community from which it is selected. Instead, the fair cross-section requirement, like all constitutionally mandated characteristics of the jury, has its origins in the purposes the Supreme Court has interpreted the sixth amendment right to jury trial to serve:

"The purpose of the jury is to guard against the exercise of arbitrary power— to make available the common sense judgment of the community as a hedge against the over zealous or mistaken prosecutor and in preference to the professional or perhaps overconditioned or biased response of the judge. This prophylactic vehicle is not provided if the jury pool is made up of only special segments of the populace or if large, distinctive groups are excluded from the pool. Community participation in the administration of the criminal law, moreover, is not only consistent with our democratic heritage, but is also critical to public confidence in the fairness of the criminal justice system."

*Taylor,* 419 U.S. at 531, 95 S.Ct. at 698 (citation omitted). Contrary to Teague's assertion that the Supreme Court decisions in *Williams* and *Apodaca v. Oregon,* 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972), require us to apply the fair cross-section requirement to the petit jury, those decisions, as well as the decisions in *Ballew* and *Burch v. Louisiana,* 441 U.S. 130, 99 S.Ct. 1623, 60 L.Ed.2d 96 (1979), require only that the jury selection process provide for the "possibility" that the jury empanelled reflect a fair cross-section of the community. The decisions of the Supreme Court make clear that absent a pattern of systematic exclusion of a particular class from the petit jury, no constitutional wrong has occurred.[9] As the court explained in *Apodaca:*

"There are two flaws in this argument [that the fair cross-section requirement requires a unanimous verdict]. One is petitioners' assumption that every distinct voice in the community has a right to be represented on every jury and a right to prevent conviction of a defendant in any case. All that the Constitution forbids, however, is systematic exclusion of identifiable segments of the community from jury panels and from the juries ultimately drawn from those panels; a defendant may not, for example, challenge the makeup of a jury merely because no members of his race are on

---

9. And the cases make clear that when a systematic pattern of exclusion is established, the Equal Protection Clause and not the sixth amendment is the constitutional provision implicated.

the jury, but must prove that his race has been systematically excluded. See *Swain v. Alabama*, 380 U.S. 202, 208–209, 85 S.Ct. 824, 829, 13 L.Ed.2d 759 (1965); *Cassell v. Texas*, 339 U.S. 282, 286–287, 70 S.Ct. 629, 631, 94 L.Ed. 839 (1950); *Akins v. Texas*, 325 U.S. 398, 403–404, 65 S.Ct. 1276, 1279, 89 L.Ed. 1692 (1945); *Ruthenberg v. United States*, 245 U.S. 480, 38 S.Ct. 168, 62 L.Ed. 414 (1918). No group, in short, has the right to participate in the overall legal processes by which criminal guilt and innocence are determined."

406 U.S. at 413, 92 S.Ct. at 1634.

However, the Supreme Court decisions distinguish between the requirement that jury pools reflect a fair cross-section of the community and the requirement that a petit jury be impartial:

> "Trial by jury presupposes a jury drawn from a pool broadly representative of the community *as well as* impartial in *a specific case.*"

*Thiel v. Southern Pacific Company*, 328 U.S. 217, 227, 66 S.Ct. 984, 989, 90 L.Ed.2d 1181 (1946) (Frankfurter, J., dissenting) (adopted by Court in *Taylor*, 419 U.S. at 531, 95 S.Ct. at 698) (emphasis added). Indeed, the Supreme Court has gone so far as to state:

> "It is fundamental in questioning the composition of a jury that a mere showing that a class was not represented in a *particular jury* is not enough."

*Fay v. New York*, 332 U.S. 261, 285, 67 S.Ct. 1613, 1626, 91 L.Ed. 2043 (1947) (emphasis added). And the court in *Taylor* read its prior decisions concerning jury composition and the fair cross-section requirement as specifically limiting the fair cross-section requirement to the jury pool from which the petit jury was ultimately empanelled:

> "It should also be emphasized that in holding that petit juries must be drawn from a source fairly representative of the community we impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the pop-

ulation. Defendants are not entitled to a jury of any particular composition."

419 U.S. at 538, 95 S.Ct. at 702 (citation omitted).

Thus, the decisions of the United States Supreme Court to date make clear that the fair cross-section requirement of the sixth amendment does not apply to the petit jury itself, and we are not persuaded that sufficient reasons or facts presented to us in this record give reason for us to expand the scope of the Supreme Court's holdings in *Teague*'s case. Several factors mandate against such an unwarranted expansion. First, the process of random selection may result in the under—or over representation of particular groups on a venire and the removal of jurors for cause likewise may result in the under—or over representation of a particular group on a petit jury in a given case. Second, the requirement that a specific group be represented on any given petit jury would necessarily entail tremendous administrative problems in the empanelling of a jury; in each case, the trial court would be called upon to expend a greater amount of time in order to ascertain the race, nationality, religion, occupation, and other characteristics of members of the community in relation to the facts and circumstances of the case on trial and determine which groups of the population were relevant, and thus essential to the composition of each and every petit jury. As we noted in *Clark*, "[t]he potential for stretching out criminal trials that are already too long, by making the voir dire a Title VII proceeding in miniature" is one of several practical considerations against requiring that the petit jury represent a cross section of the community. 737 F.2d at 682. *See also* Saltzburg and Powers, *Peremptory Challenges and the Clash Between Impartiality and Group Representation*, 41 Md. L.Rev. 337, 347–48 n. 47 (1982). The Supreme Court acknowledged these problems in a footnote in *Batson*:

> "Similarly, though the Sixth Amendment guarantees that a petit jury will be selected from a pool of names representing a cross-section of the community, *Taylor v. Louisiana*, 419 U.S. 522 [95 S.Ct. 692, 42 L.Ed.2d 690] (1975), we have never

**840**

held that the Sixth Amendment requires that 'petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population,' *Id.* at 538 [95 S.Ct. at 702]. Indeed, it would be impossible to apply a concept of proportional representation to the petit jury in view of the heterogeneous nature of our society. Such a possibility is illustrated by the court's holding that a jury of six persons is not unconstitutional. *Williams v. Florida,* 399 U.S. 78, 102–103 [90 S.Ct. 1893, 1907, 26 L.Ed.2d 446] (1970)."

*Batson,* 106 S.Ct. at 1717 n. 6. In *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), the Supreme Court further explained its reasons for not applying the fair cross-section requirement to the petit jury:

"we do not believe that the fair cross-section requirement can, or should, be applied as broadly as that court attempted to apply it. We have never invoked the fair cross-section principle to invalidate the use of either for-cause or peremptory challenges to prospective jurors, or to require petit juries, as opposed to jury panels or venires, to reflect the composition of the community at large. See *Duren v. Missouri,* 439 U.S. 357, 363–364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979); *Taylor v. Louisiana,* 419 U.S. 522, 538, 95 S.Ct. 692, 701–02, 42 L.Ed.2d 690 (1975) ('[W]e impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population'); cf. *Batson v. Kentucky,* 476 U.S. 79, ——, n. 4, 106 S.Ct. 1712, 1716, n. 4, 90 L.Ed.2d 69 (1986) (expressly declining to address 'fair cross-section' challenge to discriminatory use of peremptory challenges). The limited scope of the fair cross-section requirement is a direct and inevitable consequence of the practical impossibility of providing each criminal defendant with a truly 'representative' petit jury, see *id.,* at ——, n. 6, 106 S.Ct., at 1717, n. 6, a basic truth that the Court of Appeals itself acknowledged for many years prior to its decision in the instant case. See *United States v. Childress,*

715 F.2d 1313 (CA8 1983) (en banc), *cert. denied,* 464 U.S. 1063, 104 S.Ct. 744, 79 L.Ed.2d 202 (1984); *Pope v. United States,* 372 F.2d 710, 725 (CA8 1967) (Blackmun, J.) ('The point at which an accused is entitled to a fair cross-section of the community is when the names are put in the box from which the panels are drawn'), vacated on other grounds, 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317 (1968). We remain convinced that an extension of the fair cross-section requirement to petit juries would be unworkable and unsound, and we decline McCree's invitation to adopt such an extension."

Further, although we believe the fair cross-section requirement aids in the selection of an impartial jury, the requirement itself does not guarantee an impartial jury—and would not even if applied to the petit jury. Thus, the parties must have peremptory challenges available to them so that they might have the opportunity to eliminate any prospective juror whom they believe may not be impartial even though the jury was drawn from a pool representing a fair cross-section of the community. Further, peremptories help to ensure impartiality by compensating for the limitations inherent in the jury system itself; there is no guarantee that any group of twelve (or six) empanelled to try a case will reflect all attitudes, beliefs, etc. in a community. To prevent the unfairness of a trial heard by a panel of jurors slanted toward one view or another should chance so provide (i.e., random selection of the pool), the parties are allowed to exercise the right of the peremptory challenge in order that they might be able to select a jury that they believe will be impartial while serving their individual best interests in their sincere attempt to achieve justice. Peremptory challenges are consistent with the fair cross-section requirement to insure that the jury that ultimately tries the case will be impartial.

Moreover, many of the circuits that have addressed the issue of whether the fair cross section requirement of the sixth amendment mandates that the petit jury

mirror the community from which it is drawn have refused to extend the fair cross section requirement to the petit jury. *See United States v. Thompson,* 730 F.2d 82, 85 (8th Cir.1984), *cert. denied,* 469 U.S. 1024, 105 S.Ct. 443, 83 L.Ed.2d 369 (1984); *Prejean v. Blackburn,* 743 F.2d 1091, 1103–04 (5th Cir.1984); *United States v. Witfield,* 715 F.2d 145, 146–47 (4th Cir. 1983); *Weathersby v. Morris,* 708 F.2d 1493, 1497 (9th Cir.1983), *cert. denied,* 464 U.S. 1046, 104 S.Ct. 719, 79 L.Ed.2d 181 (1984). *Cf. Willis v. Zant,* 720 F.2d 1212, 1219 n. 14 (11th Cir.1983), *cert. denied,* 467 U.S. 1256, 104 S.Ct. 3546, 82 L.Ed.2d 849 (1984).

Finally, extending the fair cross-section requirement to the petit jury as Teague suggests would effectively undermine the use of peremptory challenges in criminal cases. We refuse to expand or enlarge the parameters of the Supreme Court decisions addressing the fair cross section requirement, for doing so would seriously disrupt the trial process as it currently exists, especially in view of the Supreme Court's explicit statements that such an expansion is not justified. *See Taylor; Fay.* In *Swain,* the court outlined the history of the peremptory challenge from the days of the common law of England to the law as it has developed in the United States and concluded that:

> "[T]he persistence of peremptories and their extensive use demonstrate the long and widely held belief that the peremptory challenge is a necessary part of trial by jury.... The [peremptory] challenge is 'one of the most important of the rights secured to the accused.'"

*Swain,* 380 at 219, 85 S.Ct. at 835 (quoting *Pointer v. United States,* 151 U.S. 396, 14 S.Ct. 410, 38 L.Ed. 208 (1894)). But the right of the peremptory challenge is not limited to the accused. The *Swain* court recognized that: "The view in this country has been that the system should guarantee 'not only freedom from any bias against the accused, but also from any prejudice against his prosecution. Between him and the state, the scales are to be evenly held.'" 380 U.S. at 220, 85 S.Ct. at 835 (quoting *Hayes v. State of Missouri,* 120 U.S. 68, 70, 7 S.Ct. 350, 351, 30 L.Ed. 578 (1887)).

The *Swain* court described the function of the peremptory challenge as

> "Not only to eliminate extremes of partiality on both sides, but to assure the parties that the jurors before whom they try the case will decide on the basis of the evidence placed before them, and not otherwise. ... Indeed the very availability of peremptories allows counsel to ascertain the possibility of bias through probing questions on voir dire and facilitates the exercise of challenges for cause by removing the fear of incurring a juror's hostility through examination and challenge for cause."

380 U.S. at 219–20, 85 S.Ct. at 835. The court further noted, "The essential nature of the peremptory challenges is that it is one exercised without a reason stated, without inquiry and without being subject to the court's control." *Id.* at 220, 85 S.Ct. at 836. " '[I]t is, as *Blackstone* says, an arbitrary and capricious right, and it must be exercised with full freedom or it fails of its full purpose.' " *Id.* at 219, 85 S.Ct. at 835 (quoting *Lewis v. United States,* 146 U.S. 370, 378, 13 S.Ct. 136, 139, 36 L.Ed. 1011 (1892)).

Teague's argument that the fair cross-section requirement of the sixth amendment extends to the petit jury and restricts the use of peremptory challenges ignores the fact that the peremptory challenge is an essential tool not only to the prosecutor, but to the defendant as well, and their combined effort to obtain a fair and impartial petit jury in their search for the truth of the facts presented and ultimate justice for all. Any requirement that would interfere with the use of peremptory challenges would harm the defendant by disarming the defendant or his attorney of the ability to rely on intuitive feelings or past trial experience in selecting the jury that will pass judgment on the defendant. The

> "system of peremptory [challenges]— challenges without cause, without explanation, and without judicial scrutiny—affords a suitable and necessary method of securing juries which in fact and in the

opinion of the parties are fair and impartial."

*Swain,* 380 U.S. at 211–12, 85 S.Ct. at 831. And the peremptory challenge " 'is, as Blackstone says, an arbitrary and capricious right, and it must be exercised with full freedom, or it fails of its full purpose.' " *Id.* at 219, 85 S.Ct. at 835 (quoting *Lewis v. United States,* 146 U.S. 370, 378, 13 S.Ct. 136, 139, 36 L.Ed. 1011 (1892)). The sixth amendment literally provides, "in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an *impartial* jury" (emphasis added). "In essence, the right to a jury trial guarantees to the criminally accused a fair trial by a panel of *impartial, 'indifferent'* jurors." *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961) (emphasis added). Although the sixth amendment provides protection only for the defendant, if we believe that the American system of justice is based on the premise that a jury trial is a search for the truth, we must acknowledge that both the prosecution and defendant are entitled to an impartial jury. Thus, the courts have recognized that "The State also enjoys the right to an impartial jury." *Spinkellink v. Wainwright,* 578 F.2d 582, 596 (5th Cir. 1978), *cert. denied,* 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979).

"The system should guarantee 'not only freedom from any bias against the accused, but also from any prejudice against the prosecution. Between him and the State, the scales are to be evenly held.' "

*Swain,* 380 at 220, 85 S.Ct. at 835 (quoting *Hayes v. State of Missouri,* 120 U.S. 68, 70, 7 S.Ct. 350, 351, 30 L.Ed. 578 (1887)); *Spinkellink,* 578 F.2d at 596.

The peremptory challenge does not conflict with the right of a defendant to have his jury drawn from a representative jury pool. Both the peremptory challenge and the requirement of the representative venire advanced the constitutional goal of obtaining a fair and impartial jury in the undying quest and search for justice. And it may be that the requirement that a a jury venire or pool represent a fair cross-section of the community in fact increases the necessity of employing peremptories to obtain an impartial petit jury.

"In contrast to the course in England, where both peremptory challenge and challenge for cause have fallen into disuse, peremptories were and are freely used and relied upon in this country, perhaps because juries here are drawn from a greater cross section of a heterogeneous society."

*Swain,* 380 U.S. at 218, 85 S.Ct. at 835. The *Swain* court acknowledged that the "peremptory challenge is a necessary part of trial by jury." *Id.* The court recognized that the challenge for cause alone is insufficient to assure the impartiality of a jury in a given case.

"While challenges for cause permit rejection of jurors on a narrowly specified, provable and legally cognizable basis of partiality, the peremptory challenge permits rejection for a real or imagined partiality that is less easily designated or demonstrable."

*Id.* at 220, 85 S.Ct. at 836. Thus, the courts have found it proper to exercise a peremptory challenge to exclude a juror who could not be dismissed for cause in the context of a given trial. *See Dobbert v. Strickland,* 718 F.2d 1518, 1524–25 (11th Cir.1983); *Jordan v. Watkins,* 681 F.2d 1067, 1070 (5th Cir.1982).

Finally, Teague's argument that *Williams* and *Ballew* require us to extend the fair cross-section requirement to the petit jury is likewise unpersuasive. Although *Williams* and *Ballew* pertain specifically to the composition of petit juries, when viewed in the proper context, they militate against Teague's assertion that the petit jury must contain a cross-section of the community: the six-person Florida jury approved in *Williams* certainly does not guarantee that the jury will consist of a representative cross-section of the community anymore than a 12–person jury. The Supreme Court in *Williams* stated:

"Even the 12–man jury cannot insure representation of every distinct voice in the community, particularly given the use of the peremptory challenge. As

long as arbitrary exclusions of a particular class from the jury rolls are forbidden ... the concern that the cross section will be significantly diminished if the jury is decreased in size from 12 to 6 seems an unrealistic one."

399 U.S. at 102, 90 S.Ct. at 1907. The court nevertheless recognized in *Ballew*, "The opportunity for meaningful and appropriate representation does decrease with the size of the panels." 435 U.S. at 237, 98 S.Ct. at 1037. Thus, it can hardly be doubted that the mathematical probability of obtaining a representative cross-section of the community is reduced when a jury is chosen consisting of six rather than 12 jurors. Notwithstanding the court's recognition in *Ballew* that a five-person jury inhibits the goal of meaningful and appropriate representation on the petit jury, the court in *Ballew* declined to retreat from its holding in *Williams*. The Supreme Court thus recognized that merely decreasing the possibility of obtaining a fair cross-section of the community on the petit jury does not violate the sixth amendment right to a trial by an impartial jury. Further, the record is barren of any proof or testimony establishing community prejudice towards Teague.

The free and unrestrained exercise of peremptory challenges does not eliminate the *possibility* of obtaining a truly representative trial jury and thus does not violate the sixth amendment right to trial by an impartial jury. *See Taylor*, 419 U.S. at 529, 95 S.Ct. at 697 (sixth amendment requires "[a] fair possibility for obtaining a jury constituting a representative cross section of the community"). So long as the jury pool contains a fair cross-section of the community, the possibility of obtaining a representative trial jury remains regardless of how either party exercises its peremptory challenges. Since the sixth amendment requires only that a jury be impartial, we refuse to extend the fair cross-section requirement to require that the petit jury trying a criminal defendant reflect a fair cross-section of the community wherein the trial takes place. Requiring the petit jury to mirror the community will effectively undermine the value of the peremptory challenge without appreciably increasing the ability of the defendant or the prosecution to insure that the jury ultimately empanelled is impartial as required by the sixth amendment—all at the expense of the American jury system.

## III

## CONCLUSION

The sixth amendment provides the defendant in a criminal proceeding with the right to a trial by an impartial jury. The Supreme Court has determined that the right to trial by an impartial jury requires that the jury pool from which the petit jury is selected reflect a fair cross-section of the community so as to make possible and probable a petit jury representative of the community in which the defendant is tried. The Supreme Court has made clear, however, that the sixth amendment does not provide the criminal defendant with the right to a petit jury of any particular composition. *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.E.2d 690 (1975). Since we are not persuaded by the defendant's argument nor the realities of trial that a petit jury that mirrors the community from which it is drawn guarantees an impartial jury, we are not willing to interpret the sixth amendment as prescribing limits on the prosecutor's (or defendant's) exercise of peremptory challenges. We are confident that all jurors, black, white, or any other race, creed or color, upon the taking of their oath are equally capable of performing their task impartially. To hold that the sixth amendment limits the use of peremptory challenges would undermine the use of peremptory challenges and impair the function of the jury in criminal trials without any demonstrable improvement in the impartiality of juries. Accordingly, we affirm the district court's order denying Teague's petition for a writ of habeas corpus.

RIPPLE, Circuit Judge, concurring.

I concur in the judgment of the court.

In my view, as Judge Cudahy points out in his dissent, Mr. Teague may properly

assert an equal protection claim in this court under the unique circumstances presented here. The Supreme Court, in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 1716 n. 4, 90 L.Ed.2d 69 (1986), refused to hold that the petitioner was procedurally barred from obtaining relief on the basis of the equal protection clause even though he had not raised an equal protection claim. I agree with Judge Cudahy that "[i]f one has no obligation to argue to the Supreme Court itself that it overrule one of its own cases, one surely need not argue to a district court that a Supreme Court case is wrong." Dissent at 845 (Cudahy, J.).

Although the equal protection claim is properly before us under the Supreme Court's ruling in *Batson*, that Court's subsequent holding in *Allen v. Hardy*, — U.S. —, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986), controls our disposition of that claim. In *Allen*, the Supreme Court held that its holding in *Batson* should not be applied retroactively to cases on collateral review of convictions that became final before the *Batson* opinion. 106 S.Ct. at 2880.

I do not believe that the sixth amendment affords Mr. Teague a basis for relief independent from the equal protection analysis set forth in *Batson*. In the period between *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), and *Batson*, the sixth amendment analysis was, I respectfully suggest, simply an elliptical way for the lower courts to avoid the precedential effect of *Swain*. *See, e.g., McCray v. Abrams*, 750 F.2d 1113 (2d Cir.1984), *vacated*, — U.S. —, 106 S.Ct. 3289, 92 L.Ed.2d 705 (1986). Indeed, in *Batson* itself, the Supreme Court seemed to acknowledge that the sixth amendment argument had played this role. 106 S.Ct. at 1716 n. 4. Further, in *Batson*, the Court deliberately noted that application of sixth amendment principles to the petit jury situation would indeed be difficult. *Id.* at 1716 n. 6.

Moreover, in deciding that the rule in *Batson* was not retroactive for cases on collateral review, the Supreme Court quite pointedly did not distinguish between equal protection and sixth amendment policy concerns when discussing *Batson*'s theoretical underpinnings:

> By serving a criminal defendant's interest in neutral jury selection procedures, the rule in *Batson* may have some bearing on the truthfinding function of a criminal trial. But the decision serves other values as well. Our holding ensures that States do not discriminate against citizens who are summoned to sit in judgment against a member of their own race and strengthens public confidence in the administration of justice. The rule in *Batson*, therefore, was designed "to serve multiple ends," only the first of which may have some impact on truthfinding.

*Allen*, 106 S.Ct. at 2880 (citations omitted). Nor can we avoid noting that, in disposing of two cases after its decision in *Batson* where the lower courts had granted relief to a state prisoner on sixth amendment grounds, the Supreme Court vacated the judgments and required reconsideration in light of *Batson* and its non-retroactivity rule.[1] If the sixth amendment analysis of those courts were worthy of independent review, there was ample opportunity to undertake the inquiry or to let the judgments of the lower courts stand. Under these circumstances, I find the subsequent denial of certiorari in *Michigan v. Booker*, — U.S. —, 107 S.Ct. 910, 93 L.Ed.2d 860 (1987), when the Sixth Circuit failed to apply *Batson* and *Allen*, worthy of little weight in our determination. In my view, therefore, the court should not address Mr. Teague's sixth amendment formulation of the equal protection claim he is barred from making because of the non-retroactive application of *Batson*.

CUDAHY, Circuit Judge, with whom CUMMINGS, Circuit Judge, concurs, dissenting:

This case was heard originally by a panel consisting of Judge John W. Peck of the

---

1. *Booker v. Jabe*, 775 F.2d 762 (6th Cir.1985), *vacated sub nom. Michigan v. Booker*, — U.S. —, 106 S.Ct. 3289, 92 L.Ed.2d 705, *aff'd on reconsideration*, 801 F.2d 871 (6th Cir.1986), *cert. denied*, — U.S. —, 107 S.Ct. 910, 93 L.Ed.2d 860 (1987); *McCray v. Abrams*, 750 F.2d 1113 (2d Cir.1984), *vacated*, — U.S. —, 106 S.Ct. 3289, 92 L.Ed.2d 705 (1986).

Sixth Circuit, Judge Coffey and me. I wrote an opinion for the majority finding that Teague had established at least a prima facie case of a violation of his constitutional rights. Judge Coffey dissented. The opinion was circulated to the active members of the court under Rule 16(e), and the court voted to hear the case *in banc.* I dissented from the order setting the case *in banc;* the order, together with my dissent (which is a much-condensed version of the original panel opinion), appears at 779 F.2d 1332 (7th Cir.1985). I rely on that dissent as a statement of my position on the merits here. After that order but before the *in banc* court heard oral argument, the Supreme Court decided *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), which, by overruling *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), determined the merits of the underlying issue favorably to the position of the original panel majority.

### I.

At the outset, I find the majority's procedural analysis far-fetched and over-reaching, although it is unclear how much of this really matters in the end. For example, the majority asserts that it is "persuaded by the State's argument that Teague did not specifically raise a *Swain v. Alabama* claim in the district court and therefore he is procedurally barred from doing so under *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977)." *Supra* p. 834 n. 6. Presumably the majority also claims a failure to raise an equal protection claim in the state courts (which would be more relevant to *Wainwright v. Sykes* ). In any event, the contention that Teague has waived his equal protection claim by failing to raise it in any of the courts prior to this one (state or federal) where the peremptory challenge issue has been argued will not stand analysis.

The short answer to these waiver arguments is that the Supreme Court itself in *Batson v. Kentucky* heard argument from the petitioner, Batson, which was directed solely to the Sixth Amendment point (and included the Fourteenth Amendment only to the extent that that amendment applied the Sixth Amendment to the states and not for equal protection purposes). The Court noted that:

> [P]etitioner has argued that the prosecutor's conduct violated his rights under the Sixth and Fourteenth Amendments to an impartial jury and to a jury drawn from a cross-section of the community. Petitioner has framed his argument in these terms in an apparent effort to avoid inviting the Court directly to reconsider one of its own precedents. On the other hand, the State has insisted that petitioner is claiming a denial of equal protection and that we must reconsider *Swain* to find a constitutional violation on this record.

106 S.Ct. at 1716 n. 4.

Chief Justice Burger's dissent in *Batson* makes a major point of Batson's failure to raise an equal protection claim either in the state courts or in the Supreme Court:

> In the Kentucky Supreme Court, petitioner disclaimed specifically any reliance on the Equal Protection Clause of the Fourteenth Amendment, pressing instead only a claim based on the Sixth Amendment. ...
>
> Even if the equal protection issue had been pressed in the Kentucky Supreme Court, it has surely not been pressed here.

106 S.Ct. at 1731 (Burger, C.J., dissenting). The Supreme Court in *Batson,* of course, ignored these arguments and so should we here. *Batson* itself is thus on all fours procedurally with *Teague.* If one has no obligation to argue to the Supreme Court itself that it overrule one of its own cases, one surely need not argue to a district court that a Supreme Court case is wrong. In *Batson* the State of Kentucky contended that an equal protection claim was being made and that *Swain* controlled. Whether or not Teague has made equal protection an issue in the Illinois courts or in the district court (and the extent to which he

has is perhaps debatable),[1] he was answered at every level by the state's contention that an equal protection claim was being made and *Swain* controlled. Having itself relied upon *Swain*, the state is estopped from arguing that equal protection was not properly raised.[2]

I thus conclude that there is no barrier based on waiver, in the prior history of this litigation or in his arguments made here, to Teague's relying on *Batson* before this court. Teague's opponents in all the courts before this one have relied on *Swain* to defeat Teague's claim. Now that *Batson* has trumped *Swain*, there can be no principled objection to Teague's present reliance on *Batson*.

This still leaves us, of course, with the problem of *Batson*'s non-retroactivity under *Allen v. Hardy*, — U.S. —, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986). At least *arguendo*, I would agree with the majority that Teague's claim must be sustainable on Sixth Amendment grounds in order to avoid the *Batson* non-retroactivity hurdle erected in *Allen*.

Teague's case is thus entirely parallel to *Booker v. Jabe*, 775 F.2d 762 (6th Cir.1985). There the Sixth Circuit, on facts similar to those before us, used a Sixth Amendment analysis to decide that the use of peremptory challenges to exclude blacks from a petit jury was unconstitutional. The State of Michigan petitioned for certiorari and, while the petition was pending, the Su-

preme Court decided both *Batson* and *Allen*. The Court then vacated the judgment in *Booker* and remanded the case to the Sixth Circuit for reconsideration in light of *Batson* and *Allen*. *Michigan v. Booker*, — U.S. —, 106 S.Ct. 3289, 92 L.Ed.2d 705 (1986).

On remand, the Sixth Circuit reinstated the *Booker* judgment and opinion, *Booker v. Jabe*, 801 F.2d 871 (6th Cir.1986); the State of Michigan again petitioned for certiorari but its petition was denied, *Michigan v. Booker*, — U.S. —, 107 S.Ct. 910, 93 L.Ed.2d 860 (1987). This sequence would, of course, strongly suggest that the non-retroactivity of *Batson*, as determined in *Allen*, had no application to *Booker* (and by extension to *Teague* ). Since the Sixth Circuit had decided that *Booker* prevailed on Sixth Amendment principles—an issue left undecided in *Batson* —its decision (entirely consistent with the result in *Batson* ) was undisturbed either by *Batson* or by *Allen*. I will, therefore, because of *Allen* join battle on the merits on Sixth Amendment terrain. I will not rely directly on *Batson*'s equal protection analysis even though, as shown, Teague did not waive his right to assert an equal protection claim in this court.

I shall, however, take account of *Batson* to this very important (in fact critical) extent: The Supreme Court in *Batson* reweighed the costs of imposing inhibitions

1. Teague contends that he made a *Swain* -based argument in the district court and in this court, citing *Weathersby v. Morris*, 708 F.2d 1493 (9th Cir.1983), *cert. denied*, 464 U.S. 1046, 104 S.Ct. 719, 79 L.Ed.2d 181 (1984). This provides an additional answer to the waiver argument.

2. *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), does not help the state here because, whether or not Teague raised the equal protection issue in the Illinois courts, those courts rejected Teague's claim on its equal protection merits. *See Ulster County Court v. Allen*, 442 U.S. 140, 152–54, 99 S.Ct. 2213, 2222–23, 60 L.Ed.2d 777 (1979); *United States ex rel. Ross v. Franzen*, 688 F.2d 1181, 1183 (7th Cir.1982). The Illinois Appellate Court rejected Teague's argument because he ostensibly failed to demonstrate that blacks had been systematically precluded from jury service, as required by *Swain v. Alabama*. *People v.*

*Teague*, 108 Ill.App.3d 891, 895–96, 64 Ill.Dec. 401, 405, 439 N.E.2d 1066, 1070 (1st Dist.1982), *cert. denied*, 464 U.S. 867, 104 S.Ct. 206, 78 L.Ed.2d 179 (1983). Since the state court denied Teague relief on the ground that *Swain* controlled the result, we could reach the equal protection claim without concerning ourselves with the cause-and-prejudice standard.

As noted, each time Teague has argued a constitutional violation, whether in the state or federal courts, his opponent and the court in question has cited *Swain* as the controlling authority. Two issues may, of course, be so factually and logically related that the raising of one affords the state courts a fair opportunity to consider both. *Williams v. Holbrook*, 691 F.2d 3, 8 (1st Cir.1982). The majority cannot plausibly conclude that Teague is now making a new or different argument when the other state and federal courts which have heard the matter have determined that *Swain* was dispositive.

upon the exercise of the peremptory challenge and of additional administrative burdens on the courts in order to sustain constitutional values in every criminal jury trial.[3] *Batson* was a policy judgment by the Court that these were costs which could and should be borne. 106 S.Ct. at 1724. If a like policy judgment becomes part of the Sixth Amendment analysis, the results of that analysis become dramatically more favorable to the defendant—even though his rights derive from a different amendment. The reweighing of costs against constitutional demands in *Batson* is a more than adequate response to the claimed inhibitions on the exercise of peremptory challenges and the administrative difficulties that the majority finds to be such decisive considerations. *Batson* completely demolishes the majority's arguments based on policy. In this respect, the majority opinion is little more than a compendium of outmoded views.

## II.

In *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), the Supreme Court held that the Sixth Amendment guaranteed that the jury pool from which juries are selected must be a representative cross-section of the community. At the time, Louisiana law required that no woman be selected for jury service unless she had previously filed a written declaration of her desire to serve on a jury; in the

*Taylor* case itself, there was no woman on the venire from which the jury was drawn. Reviewing earlier cases, the Court said that "the American concept of the jury trial contemplates a jury drawn from a fair cross-section of the community." 419 U.S. at 527, 95 S.Ct. at 696. It cited *Smith v. Texas,* 311 U.S. 128, 130, 61 S.Ct. 164, 165, 85 L.Ed. 84 (1940), in which it had held that the exclusion of racial groups from jury service was " 'at war with our basic concepts of a democratic society and a representative government,' " 419 U.S. at 527, 95 S.Ct. at 696, and went on to say:

> We accept the fair-cross-section requirement as fundamental to the jury trial guaranteed by the Sixth Amendment and are convinced that the requirement has solid foundation. The purpose of a jury is to guard against the exercise of arbitrary power—to make available the commonsense judgment of the community as a hedge against the overzealous or mistaken prosecutor and in preference to the professional or perhaps overconditioned or biased response of a judge.... This prophylactic vehicle is not provided if the jury pool is made up of only special segments of the populace or if large, distinctive groups are excluded from the pool.

*Id.* at 530, 95 S.Ct. at 697 (citation omitted).

As the majority correctly points out, this requirement of representativeness does not

---

**3.** Thus, *Batson* says:

> The State contends that our holding will eviscerate the fair trial values served by the peremptory challenge. Conceding that the Constitution does not guarantee a right to peremptory challenges and that *Swain* did state that their use ultimately is subject to the strictures of equal protection, the State argues that the privilege of unfettered exercise of the challenge is of vital importance to the criminal justice system.
>
> *While we recognize, of course, that the peremptory challenge occupies an important position in our trial procedures, we do not agree that our decision today will undermine the contribution the challenge generally makes to the administration of justice.* The reality of practice, amply reflected in many state and federal court opinions, shows that the challenge may be, and unfortunately at times has been, used to discriminate against black jurors. By requiring trial courts to be sensitive

> to the racially discriminatory use of peremptory challenges, our decision enforces the mandate of equal protection and furthers the ends of justice. In view of the heterogeneous population of our nation, public respect for our criminal justice system and the rule of law will be strengthened if we ensure that no citizen is disqualified from jury service because of his race.
>
> *Nor are we persuaded by the State's suggestion that our holding will create serious administrative difficulties.* In those states applying a version of the evidentiary standard we recognize today, courts have not experienced serious administrative burdens, and the peremptory challenge system has survived. We decline, however, to formulate particular procedures to be followed upon a defendant's timely objection to a prosecutor's challenges.
> *Batson,* 106 S.Ct. at 1724 (emphasis supplied) (footnotes omitted).

extend directly to the petit jury; no defendant has the right to a trial jury that reflects the make-up of the community. The majority opinion devotes many pages to establishing this point, though I must confess that I am at a loss to explain why. No one seems to quarrel with this proposition, least of all Teague. Appellant's Brief at 21.

Teague's position, which was adopted by the panel opinion and which even the majority here seems to endorse at one point in its opinion, *supra* p. 838, is that although there is no right to be tried by a representative petit jury, the Sixth Amendment guarantees the possibility that the jury selected will contain a representative cross-section of the community. In *Williams v. Florida*, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970), the Court held that a six-person jury was constitutionally acceptable; in *Ballew v. Georgia*, 435 U.S. 223, 98 S.Ct. 1029, 55 L.Ed.2d 234 (1978), it held that a five-person jury was not. In each case the Court was guided by the need to draw a line that would preserve the possibility of a representative jury. In *Williams*, the Court indicated that a jury should be large enough "to promote group deliberation, free from outside attempts at intimidation, and to provide a *fair possibility for obtaining a representative cross-section* of the community." 399 U.S. at 100, 90 S.Ct. at 1906 (emphasis added). In *Ballew*, likewise, the Court expressed concern "about the *ability* of juries truly to represent the community as membership decreases below six," 435 U.S. at 242, 98 S.Ct. at 1040 (emphasis added), and held that "any further reduction ... that prevents juries from truly representing their communities, attains constitutional significance," *id.* at 239, 98 S.Ct. at 1039. *See also id.* at 245, 98 S.Ct. at 1042 (White, J., concurring); *id.* at 246, 98 S.Ct. at 1042 (Brennan, J., concurring).

Thus, although the Sixth Amendment does not guarantee a representative trial jury, it does guarantee the possibility of a representative jury. It would be odd if the right to a representative jury pool did not reach, in some way or other, into the trial jury, that is, if the Sixth Amendment's reach ended with the first stage of jury selection. If the Sixth Amendment has implications for the jury pool, it can only be because it has some implication for the jury that actually sits at trial. As the Supreme Judicial Court of Massachusetts said in *Commonwealth v. Soares*, 377 Mass. 461, 387 N.E.2d 499, 513, *cert. denied*, 444 U.S. 881, 100 S.Ct. 170, 62 L.Ed.2d 110 (1979):

> It is not enough that there be a representative venire or panel. The desired interaction of a cross-section of the community does not occur there; it is only effectuated within the jury room itself.

Thus, it would be nonsensical if the Sixth Amendment's requirement of representativeness in the jury *pool* were not intended to have some sort of effect in the jury *room*.

If the Sixth Amendment does guarantee something about the trial jury, then, it can only be the *possibility* or *chance* that the various groups that make up a community will be represented on the jury, and that is the conclusion that the Supreme Court drew in *Williams*, 399 U.S. 78, 90 S.Ct. 1893, and *Ballew*, 435 U.S. 223, 98 S.Ct. 1029. The six-person jury is constitutionally acceptable because it is large enough to allow for the possibility that the jury will be representative; the five-person jury is not acceptable because it does not. The majority cites *Ballew* and *Williams* for the proposition that "merely decreasing the possibility of obtaining a fair cross section of the community on the petit jury does not violate the sixth amendment right to a trial by an impartial jury." *Supra* p. 843. The relevant question, however, is whether the possibility is decreased for a constitutionally permissible reason. Excluding jurors on the basis of race is not a constitutionally acceptable reason for reducing the possibility of a representative jury, and the majority makes no attempt to meet this argument. Race-based peremptory challenges obviously impact upon the *process* of jury selection in a way that reduces the statistical probability of a representative jury. *Fields v. People*, 732 P.2d 1145, 1155 (Colo. Sup.Ct.1987) ("The right to trial by an impartial jury does guarantee that the possi-

bility of a petit jury in a given case representing a fair cross-section of the community will not be limited arbitrarily by the discriminatory and systematic use of peremptory challenges.").[4]

The majority asserts that in this case "the record is barren of any proof or testimony establishing community prejudice towards Teague." *Supra* p. 843. The crucial question, however, is not whether the particular jurors selected were prejudiced against Teague but whether the prosecution used its peremptory challenges to reduce the possibility that blacks would be sitting on the jury, and there is overwhelming evidence that the state did just that. The prosecution and the defense each had ten peremptory challenges. The state exercised every single one of its challenges to exclude a black venireman.[5] After the state had used six of its peremptory challenges and then again after it had used all ten of its challenges, the defense moved for a mistrial on the ground that the state was using its challenges only against black jurors. In responding to the second motion, the state explained that it had excused some of the veniremen because they were very young and that it had excused others because it was attempting to obtain an equal number of men and women. The state appellate court found the prosecution's explanation unpersuasive, 439 N.E.2d 1066, 1069–70, and after examining the

manner in which the state exercised its peremptory challenges, I would agree that the state's proffered explanations were pretextual.[6]

When members of a certain group can be excluded from service on a particular petit jury, the negative effect upon defendants who happen to belong to that group is not difficult to imagine; and it will be especially severe where the group suffers from community prejudice. In such circumstances, the defendant may not even have the protection of the prosecutor's usual concern to bring only well-supported cases into court, for the prosecutor will know that the defendant's group will not be represented and that he can count to some extent upon the prejudice of the community. The protection provided by the Sixth Amendment lies in the general requirement that the state cannot interfere with the possibility that the jury will be representative. And it is that requirement that explains the need for the jury pool to be actually representative, which would otherwise be a great mystery. And it is that requirement which demands a process of getting from the jury pool to the trial jury which does not affect unjustifiably the statistical probability of any group's being represented.

Further, in a case of this sort the perception is almost as important as the reality. Knowledge that blacks could be excluded

---

4. In *Fields* the Colorado Supreme Court held that a prosecutor's use of peremptory challenges to systematically exclude Spanish-surnamed veniremen from a jury deprives a defendant of his right to an impartial jury under the Sixth Amendment of the federal Constitution.

5. It is true that the defense used one of its challenges to excuse a black; however, the husband of that juror was a policeman and since Teague's trial involved the shooting of a policeman, that decision would seem to be justified on grounds apart from race.

6. After its first challenge, every juror rejected by the state was a black woman. At that point, at which the only jurors seated were four males, the prosecution had already rejected five black women. It had also accepted three women, ultimately rejected by the defense. It is highly improbable, therefore, that in exercising its first six challenges the state was motivated to exclude women in order to achieve a balance of males and females. Of the next four jurors, all

were female; the two whites were accepted by the state and seated; the two blacks were rejected by the state. By the time the tenth juror was seated, seven were male and only three female. Yet the state accepted two males, rejected by the defense, and rejected two black females. The last two women—giving the more or less balanced result of seven men and five women which the state points to in support of its explanation—were added after the state had exhausted its peremptories. In light of this pattern, the state's explanation that it sought to balance men and women is very unpersuasive.

The state also claimed to be excluding jurors of "very young years." The state rejected four jurors who were college or business school students, or recent graduates; all were black women. The systematic exclusion of younger jurors is perhaps as pernicious as the exclusion of blacks; but in any case, this rationale cannot by itself explain the state's action.

at will by prosecutors trying black defendants, for example, would lead to cynicism among blacks in viewing the jury system. The importance of general confidence in the accuracy and reliability of the penal system—confidence that the guilty tend to be convicted and the innocent tend to be acquitted—should not be underestimated; such confidence is crucial to the deterrent effect punishment must have. We do not increase general respect for the law by simply making it easier to get convictions; and we cannot increase the respect a certain group has for the law by simply making it easier to convict members of that group. There must be the accompanying perception that the law operates with some precision, tending to convict all those and only those who are guilty. In the extreme case, the law would convict members of a group arbitrarily or at random; and of course in that case punishment would have no effect at all. But if members of a group that suffers from prejudice can be tried before juries from which fellow group members have been excluded, to some extent convictions may be perceived as attributable to prejudice against the group and therefore arbitrary. To the extent that they are so perceived, the purpose of punishment is defeated.[7]

I think it is beyond dispute, therefore, that although the Sixth Amendment does not give the defendant the right to a representative trial jury, it assures him of the possibility that his jury will contain members of the various groups in his community, a possibility that cannot be impaired by the exercise of peremptory challenges based solely on the race of the prospective juror.

The majority does not really address why it believes that the exercise of peremptory

---

7. A shocking number of defendants [in Illinois had] alleged [as of 1983] that prosecutors used peremptory challenges to exclude black people from the juries that convicted them:

*People v. Payne* (1983), 99 Ill.2d 135, 75 Ill. Dec. 643, 457 N.E.2d 1202; *People v. Yates* (1983), 98 Ill.2d 502 at 540, 75 Ill.Dec. 188, 456 N.E.2d 1369 (Simon, J., dissenting); *People v. Cobb* (1983), 97 Ill.2d 465, 74 Ill.Dec. 1, 455 N.E.2d 31; *People v. Williams* (1983), 97 Ill.2d 252, 73 Ill.Dec. 360, 454 N.E.2d 220; *People v. Bonilla* (1983), 117 Ill.App.3d 1041, 73 Ill.Dec. 187, 453 N.E.2d 1322; *People v. Gosberry* (1983), 93 Ill.2d 544, 70 Ill.Dec. 468, 449 N.E.2d 815; *People v. Davis* (1983), 95 Ill.2d 1, 69 Ill.Dec. 136, 447 N.E.2d 353; *People v. Gilliard* (1983), 112 Ill.App.3d 799, 68 Ill.Dec. 440, 445 N.E.2d 1293; *People v. Newsome* (1982), 110 Ill.App.3d 1043, 66 Ill.Dec. 708, 443 N.E.2d 634; *People v. Turner* (1982), 110 Ill.App.3d 519, 66 Ill.Dec. 211, 442 N.E.2d 637; *People v. Teague* (1982), 108 Ill.App.3d 891, 64 Ill.Dec. 401, 439 N.E.2d 1066; *People v. Belton* (1982), 105 Ill.App.3d 10, 60 Ill.Dec. 881, 433 N.E.2d 1119; *People v. Dixon* (1982), 105 Ill.App.3d 340, 61 Ill.Dec. 216, 434 N.E.2d 369; *People v. Gaines* (1981), 88 Ill.2d 342, 58 Ill.Dec. 795, 430 N.E.2d 1046; *People v. Mims* (1981), 103 Ill.App.3d 673, 59 Ill.Dec. 369, 431 N.E.2d 1126; *People v. Lavinder* (1981), 102 Ill.App.3d 662, 58 Ill.Dec. 301, 430 N.E.2d 243; *People v. Clearlee* (1981), 101 Ill.App.3d 16, 56 Ill.Dec. 600, 427 N.E.2d 1005; *People v. Vaughn* (1981), 100 Ill.App.3d 1082, 56 Ill.Dec. 508, 427 N.E.2d 840; *People v. Tucker* (1981), 99 Ill.App.3d 606, 54 Ill.Dec. 646, 425 N.E.2d 511; *People v. Allen* (1981), 96 Ill.App.3d 871, 52 Ill.Dec. 419, 422 N.E.2d 100; *People v. Bracey* (1981), 93 Ill.App.3d 864, 49 Ill.Dec. 202, 417 N.E.2d 1029; *People v. Smith* (1980), 91 Ill.App.3d 523, 47 Ill.Dec. 1, 414 N.E.2d 1117; *People v. Fleming* (1980), 91 Ill.App.3d 99, 46 Ill.Dec. 217, 413 N.E.2d 1330; *People v. Attaway* (1976), 41 Ill.App.3d 837, 354 N.E.2d 448; *People v. Thornhill* (1975), 31 Ill.App.3d 779, 333 N.E.2d 8; *People v. King* (1973), 54 Ill.2d 291, 296 N.E.2d 731; *People v. Petty* (1972), 3 Ill.App.3d 951, 279 N.E.2d 509; *People v. Fort* (1971), 133 Ill.App.2d 473, 273 N.E.2d 439; *People v. Butler* (1970), 46 Ill.2d 162, 263 N.E.2d 89; *People v. Cross* (1968), 40 Ill.2d 85, 237 N.E.2d 437; *People v. Dukes* (1960), 19 Ill.2d 532, 169 N.E.2d 84; *People v. Harris* (1959), 17 Ill.2d 446, 161 N.E.2d 809. *People v. Payne*, 99 Ill.2d 135, 152–53, 75 Ill.Dec. 643, 651–52, 457 N.E.2d 1202, 1210–11 (1983) (Simon, J., dissenting).

[I]t is an open secret that prosecutors in Chicago and elsewhere have been using their peremptory challenges to systematically eliminate all blacks, or all but token blacks, from juries in criminal cases where the defendants are blacks.

*People v. Gilliard*, 112 Ill.App.3d 799, 807, 68 Ill.Dec. 440, 446, 445 N.E.2d 1293, 1299 (1983) (footnote omitted), *rev'd*, 96 Ill.2d 544, 73 Ill. Dec. 470, 454 N.E.2d 330 (1983).

This problem is not unique to Illinois. After the Supreme Court decided *Griffith v. Kentucky,* —— U.S. ——, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), which held that *Batson* would be applied retroactively to cases pending on direct state or federal review when *Batson* was decided, the Court granted certiorari in 24 cases from various jurisdictions in which a *Batson* claim was raised, vacated the judgment in each case and remanded for reconsideration in light of *Griffith.*

challenges solely on the basis of a juror's race does not violate the Sixth Amendment. Instead, it seems to rest its opinion on the practical problems involved in restricting the exercise of peremptory challenges. I do not disagree that the peremptory challenge is itself an important guarantor of an impartial jury. The peremptory challenge allows each side to eliminate jurors it suspects, for reasons it cannot articulate or for reasons that do not reach the level of cause, of being partial to the other side. Where challenges are used in that way, the resulting jury should be closer to the ideal of a body without sympathies for either side. Since the selection of juries from the master roll is more or less random, the problem of one-sided sympathies in a group drawn for service on a particular day is not farfetched. Hence, the peremptory challenge has an important function, along with the challenge for cause, in our rough-and-ready system for arriving at impartiality. The problem I find with the majority opinion is that the Supreme Court in *Batson* has already rejected the argument that the exercise of peremptory challenges cannot be policed without destroying the effectiveness of the challenges. The majority is thus pursuing a contention that is unrelated to any particular constitutional doctrine and which has been thoroughly discredited by the Supreme Court in *Batson.*

I agree with the majority that the problems of maintaining the effectiveness of the peremptory challenge and of relieving the administrative burden on courts are the considerations which led the Court for many years to cling to *Swain.* The Court has now decided, however, that the effectiveness and credibility of the criminal justice system is at stake and these problems which traditionally aroused concern must simply be accepted and solved. This momentous policy decision by the Supreme Court opens the way just as much to reconsideration of the issues under the Sixth Amendment as under the equal protection clause. The "practical" arguments of the majority have already been answered by the highest judicial authority, and I should think they would be considered anachron-

isms rather than a source of guidance to this court in the post-*Batson* era.

For the foregoing reasons, I respectfully dissent.